Case number 16-5236. Brett Steele, appellant v. James Mattis, Secretary of Defense. Ms. Rucker for the appellant, Mr. Fehrenroth for the appellee. Good morning. Hi, good morning, Your Honors. May it please the Court. Donna Rucker on behalf of the Court of Appeals, I'm pleased to be here today to discuss the case of Dr. Steele. I'm here today because it is our belief that the trial court erred in granting summary judgment in this case and concluding that Dr. Steele had failed to establish or present evidence from which a reasonable jury could conclude or find that discrimination, age discrimination, had in fact occurred. And we assert this for three basic reasons. First, we believe that the trial court in this case particularly weighed the evidence, also made  did not provide Dr. Steele with the ability to have the evidence reviewed and were like most favorable to him. And with respect to the particular evidence that's put forth in this particular case, Dr. Steele has established or has asserted that he believes that when he came to NDU as a professor that he was given the position as a placeholder. And he believes this because very soon after starting in the position, he received what he believed to be questions and concerns about his teaching style and skill. And although in the record it shows that he made whatever adjustments were requested of him, there was still this intent and determination to... He was a probationary employee, right? That is correct, Your Honor. And so for that reason, he could have been fired for any reason, but not for an unlawful reason, right? And that is correct. Our position is that... And your claim is that the unlawful reason was he was fired because of his age. That is correct. And to establish that, you have to compare the way he was treated with others who were similarly situated, but benefited because of their age. Is that right? Well, we do, in establishing a prima facie case, in this particular case, the appellee came forward and indicated that it believed that the decision to terminate Dr. Steele in fact occurred because of budget cuts. And so with respect to articulating this proposal... What I was getting at was you have to show that others were treated well because of their age, while he was treated poorly because of his age, right? Well, that is what we've asserted in this record as well. And how have you shown that? So particularly with, let's use for example Professor Miller, who is a younger employee who in fact was at the university, also in a probationary period. And this decision which was made to release particular employees resulted in only two individuals who were faculty being released. And both of those individuals were over the age of 40. And with respect to Dr. Miller, who was allowed to remain, we believe the record evidence shows that he was not, in terms of his skills and abilities, an employee that for those reasons, as asserted by the agency, should have been someone considered to remain. Tell me about, I actually want to go back to the beginning in the prima facie case that was asserted here. The fourth prong requires that you show that he was replaced by a substantially younger person. Yes. So the people that took over his job duties right after he was dismissed were 11 years older, 6 years younger, which isn't treated as substantially, and one was 10 years younger. So if two-thirds of them don't qualify as substantially younger, only one of them might have. And his permanent replacement was, I think, about the same age, 47. Didn't hear the last part. His permanent replacement was 47. So how did you even make out the fourth prong of the prima facie case here? So with respect to looking at other individuals who were advantaged more favorably than Dr. Steele with respect to how they were treated, we are looking, in addition to the individuals whom the court has identified, the fact that very soon after Dr. Steele was allegedly released for budget reasons, the agency, in fact, hired two other individuals to work within the same department. But not to do his job. Well, they were to work within the same department as Dr. Steele was working. But if the people that replaced him were not younger, and by here we require substantially younger in this particular area, were not substantially younger. They just weren't. In fact, one was the same age. Why do we even bother looking out at other people? Doesn't that blow a hole in your prima facie case? Well, we don't Are you aware of a case, something to be more specific, where you weren't able to show the was replaced by someone of, I think, the same age. Wasn't he 47 when he was dismissed? Well, we cannot, Your Honor, in our position at this particular point Are there cases where we then said, okay, even though you were replaced by someone the same age, we're going to start looking around at other people who were also teaching, but teaching different things, and see what happened there. Or do we look and say, look, you were replaced by someone who was just the same age as you. That's the end of the prima facie story. Well, it only is the end of the prima facie story if that is consistent, we believe, with the record of what has been presented. So it is true and correct that these individuals who actually remained and began doing the work were individuals who were older. And the person who actually took his position was the same age. They taught the course. Several professors taught the same course during the evening and other times. What we are pointing out But there was a permanent replacement a year or so later. There did have a permanent replacement. And it was 47. That is correct. Okay. But what we're trying to point out, Your Honor, what we did point out in this particular record is the fact that for those individuals who came forward subsequent to Dr. Steele's removal, we are looking, if you look exclusively at what the university did after Dr. Steele was asked to leave, the record that we present deals with the issues of whether or not it was actually correct that Dr. Steele could not teach some of the courses that were going to come in later. So that is the position that we took. Well, we only look at pretext. Pretext helps you, but you have to have a prima facie case for that to go with, right? That is correct. So the pretext, if you haven't made out a prima facie case, pretext isn't going to get you past summary judgment. If you have made out a prima facie case, then pretext could get you past summary judgment under Reeves. So the question is, when you haven't made out a prima facie case because your replacements were not younger, relevantly younger, substantially younger as is required, in fact, your permanent replacement was exactly the same age, and one was 11 years older than you, then what does it matter if you show pretext that they didn't say the right reason? Well, I do understand that, Your Honor. But when you look at Dr. Miller, for example, the individual that I was pointing out who is substantially younger, he is one of those individuals who was supposedly teaching the courses that Dr. Steele was supposed to teach. Right. And another one was 11 years older. That is correct. So it looks like for at least temporarily, his job was split to three people. But the two people who were fired as faculty members were both over the age of 40. And what we point out in this record is there seemed to have been a pattern and a trend of getting rid of the older employees. Now, to the extent that they've retained one or two with respect to the example that you listed. Does that pattern or trend rely upon your statistical calculations? Is that where you show that? Well, it's from the employment records. It shows with respect to the retention. Because there are lots of problems with the statistical calculations you... We're not relying very heavily on the statistical calculations that Dr. Steele offered. Okay. Okay. But we pointed out... I'm sorry. No. We pointed out simply because the records with respect to how and who it is that they hire or retain tends to show this trend, we believe, with respect to retaining younger individuals and getting rid of individuals who are older. Why don't you rely on the statistical calculations more than I'm... Well, we do rely on it. Why do you rely on it at all? I mean, it doesn't have any of the relevant confounders. Retirement, range of species, experience and skills. It's terribly flawed. Well, we don't have to in these particular individual cases look very closely when we're talking about one particular individual as we are in this case, being the victim of discrimination. Let me ask you, Ms. Ruffer, a really preliminary question. Okay. I was puzzled as to why it wasn't briefed in this case, the applicability of the Ford v. Davis decision from the circuit, which points out that for federal employees, it's unlawful for age discrimination to be a factor. It doesn't have to be the cause. That is correct. Only if you're looking for specific damages beyond... Right. Yes. And I wondered whether that's because you're not pursuing that. That is correct. You're not? That is... Well, we are, in fact, pursuing an A factor. So we believe that both exist in this particular case, because if it's actually the but-for cause, it's clearly a factor as well, is how we were reading the record in terms of what we presented here. And again, what we pointed out and what we believe we pointed out in this particular case, the judge himself, in looking at this in the lower court, at the record at DA, Deferred Appendix 88-5, specifically points out that he thinks the pramifacia case is weak. And in that instance, he is acknowledging that there are some elements of what has been presented. I think it alludes to what you were saying. I'm just asking you how it's met here. That's correct. I think the district court was going, look, they've said they're legitimate reason. I'm not going to... I'm just going to say it's weak and move on, because they presented a reason. I'm going to move to the next stage. But for your purposes, for summary judgment analysis, we go back and we look at what was shown at the pramifacia case, and then we look at other things, like the pretext that you're arguing. That is correct. I put them together, but when I went to try to add them together, I couldn't understand how you met the fourth prong in your pramifacia case. And I have to analyze the evidence here to see if you've got enough to get past summary judgment. So I think I'm going to ask you the question, even if the district judge blew past it. I do understand. I see that my time is up, Your Honor. Keep answering. Thank you. So with respect to the position about it, when the court says, as the judge does in this particular case, that the pramifacia element seems to be weak, with respect to Dr. Miller, he is specifically pointing out, the judge is specifically pointing out, that we have two individuals, Dr. Yuko as well as Dr. Miller, who are coming on board. What we believe is significant and relevant with respect to those individuals is this determination that these individuals were not proper comparators with respect to whether or not there was a disadvantage, treatment that was disadvantaged to Dr. Steele versus these other individuals. That's the point that I want to talk about. Thank you. Okay. Thank you very much. Thank you. Good morning. May it please the Court, Peter Fafner for the government. I agree with the questions that were being posed. I mean, as a threshold matter, the plaintiff never stated a pramifacia case. And where did you state a legitimate non-discriminatory reason for firing him? You said you had to get rid of three people for budget reasons, but that doesn't explain why you fired him. It's a process of elimination, Your Honor. How did you state, what was your legitimate reason for getting rid of him? Three spots had to be eliminated. Yes, and you've got to explain why you picked him rather than the other three people that were left behind, and the reason was? And the reason is that they couldn't get rid of people for whom funding had not been cut, so that accounts for Dr. Ukko. They did not get rid of Dr. Miller because Dr. Miller was a specialist in Afghanistan and Pakistan, which the Joint Chiefs had told NDU to focus upon, and they did not get rid of Dr. Parker, who was 59 years old, because he had skills that were, likewise, incredibly valuable to NDU, and this Court should not try to look too deeply into NDU's assessment of what its teaching needs were at that time. Why? Why? To determine whether something is legitimate and non-discriminatory, we have to look. Of course you have an obligation to inquire into whether there was an unlawful basis and a pretextual basis for removing someone, but at the same time, this Court is not well-positioned to evaluate, particularly in the context of a higher educational institution like this one. Why do you say particularly? You're saying it, and the district court said it, and I can't for the life of me figure out why, when it comes to discrimination cases, that we assume or give any extra leash to those involved in education than we would to those involved in medical care, running the military itself, actually conducting wars, these types of things. I don't understand where that comes from, and you're arguing for it, too. Our position doesn't hinge upon that, Your Honor, but I do think that it is different, because professors are not interchangeable the way that, for instance, a surgeon might be. Of course, every surgeon might be a little bit better at this surgery than at that surgery, but ultimately, most faculty members at most educational institutions have a specific focus on a specific area, and they... Presumably that's why Dr. Steele was hired in the first place, though, right? It added... It was sort of a luxury more than... What? A luxury. You went after him. You offered him one thing, and he turned it down. You offered him a certain set of skills that was valuable, so he was hired, and you're then saying somehow and later those skills weren't quite so valuable? Ten months later. I'm not saying that those skills were not valuable. It was certainly valuable... It's him and Parker. I understand your argument about UCO. The funding hadn't been cut. Although I have a question about UCO. Makes sense. And I understand your point about Miller, but I can't quite understand the distinction between Steele and Parker here. Well, at the first point, the plaintiff, the appellant, says he can't really compare himself to Parker, so he certainly considers Parker to be at least his co-equal. They were both folks with very impressive resumes. Why was Parker kept and Steele fired? Why? At the end of the day, if the question is simply Parker versus Steele, and I understand that to be where the court is going, Parker had very high reviews, and as the record establishes, if one is comparing 59-year-old Dr. Parker with 47-year-old Dr. Steele or 48-year-old Dr. Steele, Dr. Parker simply had shown himself to be even more valuable to the institution. Was that ever communicated to Dr. Steele? Not in a way that he was required to. First of all, he's a probationary employee, so you don't have to give them an explanation. Well, you have to give a legitimate non-discriminatory reason. Yes, and the legitimate non-discriminatory explanation provided through litigation, which is the point at which this becomes relevant, is that Dr. Parker had really thrived at the institution, and he was very, very valuable. Well, that's a disputed fact, because he says he had great reviews from students, and Steele doesn't, that they were all upset when he was fired. I'm talking about disputed facts. I have no idea what the truth is. But Steele doesn't actually dispute that Dr. Parker was qualified to remain. Well, I'm sure he thinks that they were, he can agree with that and think he's just as entitled to remain as well. That doesn't get you to a legitimate non-discriminatory distinction. And then as to Ms. Miller, the Afghan Studies one, is that right? Mm-hmm. Miller, yes. Right, and so, again, you know, it seems like Mr. Steele was chased, a great expert in his field, and was chased after enough that when he turned down North Carolina, came back after him again just 10 months earlier and said, okay, okay, okay, we'll let you, you know, please come to D.C. or wherever this one was. And so what basis, other than the assertion that we wanted the Afghanistan stuff, was there even for distinguishing between them? Sorry, for distinguishing between? The subject matter. They taught different subject matters, but you were in, you know, hot pursuit of Dr. Steele for what he taught just 10 months earlier. So I'm trying to understand. He was teaching, he had a background in economics. He says he, in the record, he also says he has a background in engineering and a background in history, and those are all relevant. And that's why he was initially recruited. But at the end of the day, a year in, the budget situation changed and they had to make some hard decisions, and they reasonably made the decision that based upon the Joint Chiefs Directive, they were going to focus on Central and South Asia. I have a couple of questions about the funding. One is, Dr. Uko, you said that his funding for his position was secure in the Counterterrorism Fellowship Program, is that right? That's right. There also was testimony, though, by Dr. Hanlon, that funding for the Counterterrorism Program was secure. So I had thought that was an issue in dispute. It's page 625 of the Joint Appendix. She said funding for that was secure. So isn't that a kind of issue we can't just assume that's undisputed? I think I'm misunderstanding what you just said, because the point was that the counterterrorism funding, which provided for Dr. Uko, was secure. And I don't believe there's a dispute in the record. There's nothing other than just assertions to suggest that it was not still in place. So that's the funding for? Uko. I thought there were two different pieces of testimony. One says it's not secure and one says it is secure. I'll have to follow up. I don't believe that. My question about funding, though, is that quickly after this, you have two people that are brought on. So it was a very temporary funding problem. It's just not really clear how. It seems like there was a lot of turnover in a short period of time. And during that period of turnover, the number of people over the age of 40 dropped precipitously. But there were a lot of people brought on. First of all, Your Honor, it's a factual matter. Even the statistics, such as they are. I think of it as sort of anecdotal evidence of numbers. They actually show that people in their 40s and in their 50s, if you look at those 10-year periods, they actually increased between 2011 and 2014, based upon that very evidence. This is a point we made in our brief, and it's based upon the records that the appellant submitted. In any event, the people who were brought on around about the time that Dr. Steele was let go were people, again, who were focused on South and Central Asia, as opposed to the more generalist category of Dr. Steele. If the Court has nothing further. So I'm just trying to identify, because I didn't mean to confuse you about the counterterrorism program. What I'm thinking about is on page 625 where Dr. Hanlon says there were continual discussions with the funding organization. There was discussion about billets being reduced. The funding was also going to be reduced for that program at Fort Bragg as well as for the program, the counterterrorism fellowship program. She says the funding was going to be reduced for that. So that was what made me think there was some amount of dispute about whether it was secure or whether it was actually in jeopardy. The rest of the record, Your Honor. I think I see what you're referring to, but I also see two hyphens before that, and it seems like that was, you know, I don't believe that this is a particularly clear statement. She doesn't finish the sentence. It seems that she was interrupted. In any event, she doesn't actually say that the counterterrorism fellowship funding was being reduced. She's talking about other billets that are being moved around and that are being reduced, and there is clear evidence in the record that the counterterrorism fellowship program that funded Dr. Uko was not being reduced. But then she seems to say that Dr. Steele, his funding was tied to that program. So if it's secure, then he would, just as Dr. Uko, have a secure footing, or if it's not secure, then that doesn't distinguish between the two. I don't know what to read into the tied to that program. I don't either because I'm just reading this record. But in terms of disputes, it just struck me that, you know. Right. There's quite clear evidence in the record that there was a directive from on high at DOD that NDU had to get rid of 17 positions, 17 FTE positions on the research side, and they got rid of CISA's, or College of International Assay, a piece of that was going to be three positions, and they had to come up with three names. And can you fill us in at all on why they were quite quickly hiring two new employees? Because they had sought waivers earlier on, and that that waiver would have, in fact, protected Dr. Steele, and so that's evidence against, you know, an animus based upon age. And while that waiver was being sought, and around about the time that the Joint Chiefs had said, go out and really build up your Afghanistan, Pakistan, Central, and South Asia focus, they started that hiring process, and funding specifically for those kinds of positions was located, given the Joint Chiefs' emphasis. And whereas, but just because there were some hiring decisions made around the time that the completion of an earlier removal process in order to try and right size the CISA generally, given the funding limitations that had come to light, just because those additional hiring roles were being made, doesn't mean that they had to go back and undo decisions that had already basically been finalized, and we were simply waiting for the last day. And just to, you know, sort of fill us in on the nature of this, are there kind of permanent faculty at CISA, or is it more people come through for stints of three years, and I mean, is there a lot of turnover, or not? I'm not an expert on CISA. What I've seen on the record indicates that people tend to be on three-year terms. So this isn't like a typical college where people come and they stay for a big chunk or all of their career. It's not a permanent faculty. I'm informed by agency counsel. But what I've seen on the record is the three years that are referenced in a number of places, that people have three-year contracts, basically the first of which is a probationary period. And do you have a position on Ford versus Mavis and whether, you know, you didn't argue that you met the age that was not a factor, but I assume that you think it's covered by the position that you've taken, which is age was not part of it at all. No, age wasn't a part of it. But I do think actually that in the context here, if you look at the complaint, she's seeking, or sorry, Dr. Steele is seeking back pay. And in light of that, but for is the standard. What about the evidence that Dr. Villanueva said, you know, isn't it great working with young people and those old people are so stubborn and difficult? That seems to me to be arguably evidence that could move a jury. But it's not relevant, Your Honor, because, A, it's a stray remark. Well, that's a legal characterization. You just say, I don't want that to move a jury. Well, I was going to hang on. If she had said instead, I'm so glad we've been hiring the white people and those black people are so impossible to deal with. What a fresh air to have more white people. Would you stand here and say it's a stray remark? Or would you say that's powerful stuff for a jury to consider? I would say I would go on to provide the rest of the answers. Would you say that that was a stray remark or not? If she was a decision maker, I wouldn't. You don't have to be the decision maker. There's cat's paw liability. So try again. Would you say it's a stray remark if it said the same thing about race rather than about age? I would ask, is it around about the time the decision was being made? You can't tell me whether you would still call it either it's a stray remark or not. I would be very troubled by that kind of remark. Exactly. So age is just less protected in your view? It's okay to just brush that off as a stray remark, but it's not okay to brush off other forms of discrimination? Is it a lesser form of discrimination? What is a stray remark under this Court's jurisprudence is largely in the eye of the holding panel. There are a variety of- Usually direct statements about I don't want to work with that protected class. I'd rather work with people outside that protected class. They're not stray remarks. That's not direct evidence. The record is that I don't want to work with people of the protected class. I'm so much happier to be working with people outside the protected class. Those in the protected class are cantankerous and difficult to deal with. What was said about race or about women during the time of his 10-month tenure here? There are other factors that go in as well to the fact that she had just played a role in bringing on this particular individual. That might be that you have other arguments. My only point is your characterization of it as a stray remark, which, to be fair, I think was a district court's characterization, but that's my concern. What weight do you place on the fact that she was not involved in the termination decision? I place weight on that. The fact is she was ahead of the department, but she was not in a decision-making role. She may have been a fly on the wall in a meeting where she talked about how Dr. Steele was doing. Where's your record for fly on the wall? She said, yeah, I had input. She said she was there and she provided input. And she was a direct supervisor. So if I were the head honcho, I think the people whose input would be the most important to me would be the people who are directly supervising the individual. No? But at the end of the day, also, as I explained earlier, I think it's really the process of elimination approach that gets you to Dr. Steele has to go because Uco and Miller are both really essential to the programmatic needs of the program, and Dr. Miller, I'm sorry, Dr. Parker. That sounds more like a disputed fact, whether theirs was more essential than the others. Originally it was just budget cuts, but that's not legitimate non-discriminatory because that doesn't narrow it down. So now it seems to be budget cuts made us decide that he's less qualified, and then that seems to sound more like the type of thing he's disputing. There is in the record the letter at page DA780 and 781 from 30th of August, 2011, that provides, that explains the entire removal process and the entire analysis of Dr. Steele and his role at CISA. But on 745, we have Bologna's. I was involved. Not necessarily in the decision, but yes, in discussions of issues that may be connected. And when she talks about her having these conversations. Flying the wall is not the right characterization. You're right. It sounds to me like the supervisor in Staub v. Proctor Hospital, which was the cat's paw case in the Supreme Court, was the direct supervisor who didn't make the decision but fed information to the decision maker, and that was held to be sufficient. And so what I'm asking is why not fly on the wall, involved, yes, but not the decision maker, and making comments that are directly about a preference for working with people outside the protected class, why those two together don't add up to a ground on which a jury could or could not find a cat's paw form of liability here. I'd also note that as we state in our brief, cat's paw was not argued in this fashion in the district court, so it's been waived. What do you mean by it has to be argued in this fashion? Don't they just have to come forward with summary judgment evidence from which a jury could infer discrimination? Is there any law of this circuit that says you have to specifically have a distinct claim about cat's paw liability and claim there's discrimination here? There's just one form of provenance. Where do you have to say? Is there any authority that says you have to do more than what they did? The general rule is that we want arguments to be adjudicated in the district court first so that it facilitates appellate review. But she did make the argument. She did point to Volanos' assessment as if she was part of the decision making. But she made these terrible comments. It seems like if you don't use the term cat's paw, that can't be the basis. Just to say here's somebody, here's her role, she was in the meetings, I'm not disputing that she was the ultimate, ultimate decision maker. There's nothing surprising about that presentation from the perspective of either the government or the district court. Is there in terms of, oh, that's cat's paw, I didn't know? No. No. If the court has something further, I'd ask that the case be referred. Thank you very much. Thank you. Thank you. Ms. Rucker, we'll give you two minutes for rebuttal. I wanted to address, Your Honor, with respect to the issue of what was elicited from the counsel about the reason. And it appears to be correct that the reason being offered is to the distinction between Dr. Steele has to do with this alleged belief that funding was not available. I think the record is clear that at the deferred appendix at 625, there is this discussion with respect to the counterterrorism funding being cut as well, and specifically with the Fort Bragg billet, which is what Dr. Steele has been told he's working under. So to the extent that that is correct, then it does create a question, we believe, as to what is actually happening here, and a reasonable jury could conclude that this is offered as pretext. Can I ask you just, I'm just going to tell you up front the one thing that I'm having trouble getting past, and that is he was hired and fired by essentially the same people, Hanlon. And he was hired at 47, and just 10 months later, so now he's 47 and 10 months, or something like that. Fired by them. But replaced by people who were not substantially younger. Could a reasonable jury find age discrimination there? We believe yes, and here's why. With respect to the fact that he was both hired and fired in a very short period of time, we have to look at the totality of the record and the evidence in this case. And from the beginning, we've always asserted that Dr. Steele was brought there as a placeholder. The record is very clear that... I don't understand why that's got to do with age discrimination. If I may continue. The record is very clear that if Dr. Steele's position had not in fact been filled, that the university would have lost the opportunity to have that particular position in its next budget. We also see then individuals who had not particularly had the opportunity to complete their thesis coming on board, not really being as qualified in terms of professors with Ph.D. in place, teaching experience, experience teaching, for example, military individuals or teaching at a military university. And so with respect to the issue of whether or not this was, I believe, and we believe, Your Honor, calculated in in terms of the reason, I think that it very much diminishes this issue of I hired him and then a few months later I'm firing him. I believe age was actually the motivating factor. There was never a genuine intent. So you think placeholder means age? Well, I'm saying in this case they held him and his age was a reason why he was not considered a good fit. And as you'll know from this record, he is repeatedly referred to as not being a good fit. And we are speaking in that way. The last point that I wanted to make with respect to this record is that with respect to the decision about Ilko, it is correct that this individual was coming in to teach particular programs in counterintelligence, but we cannot overlook the fact that with this particular record, it shows that Dr. Bell, when he was questioned, acknowledged that Dr. Steele had teachings and this record shows that Dr. Steele taught with respect to the regions both in Afghanistan, Pakistan, and in the South Asia region as well. This was information that Dr. Steele provided to Colonel Bell to show him why he was able and allowed to work in these particular departments. Where's the Joint Appendix for that? Your indulgence. You don't have it handy. Certainly, I do. I believe I have it here. Not to hold you up, Your Honor. I will provide that. It's a particular point in the record where Dr. Bell acknowledges that he did not read Dr. Steele's file. So we submit that that is further evidence that in making these alleged decisions that Dr. Ilko was more an appropriate person because of the teachings in Afghanistan and South Asia. Again, subject to pretext because there is just no reasonable juror could conclude that you're simply saying that as pretext to mask the actual discrimination in this case. And with that, I would ask that this Court, based on the evidence in this record and the arguments presented today, remand this matter forward to proceed and go forward with trial. Thank you for your time. Thank you very much. The case is submitted.
judges: Griffith, Millett, Pillard